UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————

CITIZENS FOR RESPONSIBILITY    :
AND ETHICS IN WASHINGTON       :
                               :
        Plaintiff,             :
                               :
    v.                         :    Civil Action No. 13-1159 (GK)
                               :
UNITED STATES DEPARTMENT       :
OF JUSTICE                     :
                               :
        Defendant.             :
———————————————————

## MEMORANDUM OPINION

Plaintiff Citizens for Responsibility and Ethics in Washington ("Plaintiff" or "CREW") brings this action against the Federal Bureau of Investigation ("FBI"), a component of the United States Department of Justice ("Defendant" or "DOJ"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. This matter is currently before the Court on the Parties' Cross-Motions for Summary Judgment.

CREW seeks records concerning drone and Unmanned Aerial Vehicle ("UAV") use by the FBI from January 1, 2009, onward. The FBI conducted a search for records responsive to CREW's FOIA request, produced documents to CREW, and provided a Vaughn index for all documents that were withheld in full or in part under one of FOIA's several exemptions. CREW challenges the FBI's application of FOIA Exemptions 1, 3, 4, 5, and 7(E) to withhold

-1-

certain responsive information. CREW also alleges that the FBI
failed to segregate and release all non-exempt information
responsive to CREW's FOIA request.

Upon consideration of Defendant's Motion for Summary Judgment
("Def.'s Mot.") [Dkt. No. 17], Plaintiff's Cross-Motion for
Summary Judgment ("Pl.'s Mot.") [Dkt. No. 19], Defendant's
Opposition and Reply ("Def.'s Opp'n") [Dkt. No. 23]; Plaintiff's
Reply ("Pl.'s Reply") [Dkt. No. 25], supplemental memoranda, and
the entire record herein, and for the reasons stated below,
Plaintiffs' Motion for Summary Judgment shall be **denied** and
Defendant's Motion for Summary Judgment shall be **granted**.

I.   **BACKGROUND**

A.   **FOIA**

FOIA was enacted by Congress "to ensure an informed citizenry,
vital to the functioning of a democratic society." Critical Mass
Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872
(D.C. Cir. 1992) ("Critical Mass III"), cert. denied, 507 U.S. 984
(1993) (citing FBI v. Abramson, 456 U.S. 615, 621 (1982)). "In
enacting FOIA, Congress struck the balance it thought right--
generally favoring disclosure, subject only to a handful of
specified exemptions--and did so across the length and breadth of
the Federal Government." Milner v. Dep't of the Navy, 562 U.S.
562, 571 n.5 (2011). FOIA's "basic purpose reflect[s] a general
philosophy of full agency disclosure unless information is

exempted under clearly delineated statutory language." Dep't of the Air Force v. Rose, 425 U.S. 352, 360-361 (1976) (internal citations and quotation marks omitted).

When an agency receives a request for records, the agency must conduct a sufficient search within the scope of the request. 5 U.S.C. § 552(a)(3). The agency then must furnish the information in a timely manner, unless the information is precluded from disclosure by one of FOIA's nine exemptions. Id. § 552(b). FOIA's "goal is 'broad disclosure'" and thus "the exemptions must be 'given a narrow compass.'" Milner, 562 U.S. at 563 (citing U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989)). The Government always bears the burden of proving that exemptions apply to any responsive information that it withholds. 5 U.S.C. § 552(a)(4)(B).

### B.   Factual Background

#### 1.   CREW's FOIA Request

On June 26, 2013, CREW submitted a FOIA request for documents ("FOIA Request"), Def.'s Ex. A [Dkt. No. 17-2], to the FBI. CREW's request sought four categories of documents:

1. Records sufficient to show the source or sources of all drones used by the FBI from January 1, 2009, to the present;

2. Records sufficient to show the funding source for all drones used by the FBI from January 1, 2009, to the present,

including specific appropriations and non-appropriated
sources of funds used for this purpose;

3. Records sufficient to show who provided the FBI with any
training to enable the FBI to use drones; and

4. Records reflecting or discussing any policy concerning the
FBI's use of drones for any purpose, including but not
limited to the legal justification for such use, and any
memos of understanding between the FBI or DOJ and any other
government agency or entity.

FOIA Request at 1.

CREW also requested that the FBI expedite the processing of
CREW's request pursuant to 5 U.S.C. § 552(a)(6)(E)(i) and 28 C.F.R.
§§ 16.5(d)(1)(ii), (iv). FOIA Request at 4-5. CREW explained that
there was particular urgency to inform the public about the FBI's
use of drones to conduct domestic surveillance and that it was a
matter of widespread and exceptional media interest. Id. The FBI
denied CREW's request for expedition by letter on July 3, 2013.
See Def.'s Ex. D [Dkt. No. 17-2].

Plaintiff filed its Complaint ("Compl.") in this matter on
July 30, 2013 [Dkt. No. 1]. On February 4, 2014, the Court ordered
that the FBI process at least 1,500 pages of responsive records
per month [Dkt. No. 12]. Between November 27, 2013, and May 30,
2014, the FBI made six interim releases and one supplemental

-4-

release of records. <u>See</u> Defendant's Statement of Material Facts ("Def.'s Statement of Facts") ¶ 4 [Dkt. No. 17].

On June 16, 2014, the parties filed a Joint Status Report in which the FBI informed the Court that it had finished processing CREW's FOIA request. <u>See</u> Joint Status Report, 2 [Dkt. No. 14]. In total, the FBI identified 6,720 non-duplicative pages of responsive documents, of which it released 1,970 in whole or in part. The rest were withheld in their entirety as exempt under several of FOIA's exemptions. <u>Id.</u>; <u>see also</u> 5 U.S.C. § 552(b).

### C.   Procedural Background

On October 15, 2014, DOJ filed its Motion for Summary Judgment ("Def.'s Mot.") [Dkt. No. 17]. On January 5, 2015, CREW filed its Opposition and Cross-Motion for Summary Judgment ("Pls.' Mot.") [Dkt. No. 19]. On February 13, 2015, DOJ filed its Opposition and Reply ("Def.'s Opp'n") [Dkt. No. 23]. On March 23, 2015, CREW filed its Reply ("Pl.'s Reply") [Dkt. No. 25]. CREW filed a Supplemental Memorandum ("Supp. Mem.") [Dkt. No. 26] on March 31, 2015, and DOJ filed a Response on April 14, 2015 ("Supp. Response") [Dkt. No. 27].

Defendant contends that the FBI released all responsive records to CREW's FOIA request and properly withheld information pursuant to FOIA exemptions 1, 3, 4, 5, 6, 7(C), and 7(E). CREW challenges the FBI's application of FOIA Exemptions 1, 3, 4, 5, and 7(E) only. It does not challenge withholdings under Exemptions

-5-

6 or 7(C). CREW also alleges that the FBI failed to segregate and release non-exempt information responsive to CREW's FOIA request.

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment should be granted only if the moving party has shown that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "FOIA cases typically and appropriately are decided on motions for summary judgment." Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).

"To prevail on summary judgment [against a FOIA challenge], the defending 'agency must show beyond material doubt [] that it has conducted a search reasonably calculated to uncover all relevant documents.'" Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). "Summary judgment may be based on

affidavit, if the declaration sets forth sufficiently detailed information 'for a court to determine if the search was adequate.'" Students Against Genocide v. Dep't of State, 257 F.3d 828, 838 (D.C. Cir. 2001) (quoting Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995)).

If an agency denies disclosure of responsive records, either in whole or in part, based upon FOIA exemptions, it then "bears the burden of proving the applicability of claimed exemptions." Am. Civil Liberties Union v. U.S. Dep't of Def., 628 F.3d 612, 619 (D.C. Cir. 2011). "The government may satisfy its burden . . . by submitting appropriate declarations and, where necessary, an index of the information withheld [(known as a "Vaughn index")]." Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec., 852 F. Supp. 2d 66, 72 (D.D.C. 2012) (citing Vaughn v. Rosen, 484 F.2d 820, 827-28 (D.C. Cir. 1973)).

There is no set formula for a Vaughn index or declarations, but they must "provide[] a relatively detailed justification [for any nondisclosure], specifically identif[y] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply." Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977)). But, "exemptions from disclosure must be narrowly construed and conclusory and

generalized allegations of exemptions are unacceptable." <u>Morley</u>, 508 F.3d at 1114-15 (internal quotation marks and citations omitted).

## III. ANALYSIS

### A. Sufficiency of the Search for Responsive Records

As mentioned above, to prevail in a summary judgment motion, an agency "must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." <u>See Steinberg v. United States Dep't of Justice</u>, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting <u>Weisberg</u>, 745 F.2d at 1485).

DOJ has detailed the steps the FBI took in conducting the search, the databases searched, and additional measures taken. <u>See</u> Def.'s Mot. at 4-5. The Declaration of David M. Hardy ("Hardy Decl.") [Dkt. No. 17-1] provides additional details regarding the steps the FBI undertook in conducting its search for documents. CREW does not challenge the reasonableness of the FBI's search for responsive documents and the Court concludes that the FBI's search was reasonable and adequate.

### B. FOIA Exemptions

CREW argues that DHS improperly withheld and redacted documents under various FOIA exemptions. The Court will consider each exemption in turn. For all of FOIA's exemptions, the burden of proof lies with DOJ to show proper application of the Exemption. 5 U.S.C. § 552(a)(4)(B). The Court makes a presumption of good

faith on behalf of agency affidavits purporting to meet DOJ's burden. Negley v. FBI, 169 Fed. Appx. 591, 594 (D.C. Cir. 2006). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Am. Civil Liberties Union, 628 F.3d at 619 (quoting Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)). Thus, "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980)

### 1. FOIA Exemption 1

FOIA Exemption 1 precludes disclosure of documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

It is undisputed that the requirements for classifying information relevant to this request are contained in Executive Order 13,526 ("E.O. 13,526"). See Def.'s Mot. at 7-8 (citing Exec. Order No. 13,526, 75 FR 707 (Dec. 29, 2009) (codified at 32 C.F.R. Parts 2001 and 2003)); Pl.'s Mot. at 13. Executive Order 13,526 provides that information may be classified if:

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of [E.O. 13,526]; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 13,526 § 1.1.

The FBI withheld two categories of classified information pursuant to FOIA Exemption 1: (1) intelligence activities, sources, and methods (E.O. 13,526 § 1.4(c)); and (2) foreign relations or foreign activities (E.O. 13,526 § 1.4(d)). See Hardy Decl. ¶ 40.

   a. *Intelligence Activities, Sources and Methods*

Information that "pertains" to "intelligence activities (including covert action), intelligence sources or methods, or cryptology," which, if disclosed, could cause damage to the national security, is eligible for classification. E.O. 13,526 § 1.4(c). Our Court of Appeals has noted that "'pertains' is 'not a very demanding verb.'" Judicial Watch, Inc. v. U.S. Dep't of Defense, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting Judicial

Watch, Inc. v. U.S. Dep't of Defense, 857 F. Supp. 2d 44, 60
(D.D.C. 2012)).

"Intelligence" includes foreign intelligence and
counterintelligence, as defined by Executive Order 12,333. E.O.
13,526 § 6.1(x). "Foreign Intelligence" is defined as "information
relating to the capabilities, intentions, or activities of foreign
governments or elements thereof, foreign organizations, foreign
persons, or international terrorists." Exec. Order No. 12,333, 46
FR 59941 (December 4, 1981), § 3.5(e), as amended by Exec. Order
Nos. 13,284 (January 23, 2003), 13,355 (August 27, 2004) and 13,470
(July 30, 2008). "Counterintelligence" is defined as "information
gathered and activities conducted to identify, deceive, exploit,
disrupt, or protect against espionage, other intelligence
activities, sabotage, or assassinations conducted for or on behalf
of foreign powers, organizations, or persons, or their agents, or
international terrorist organizations or activities." Id. at
§ 3.5(a). By definition, "intelligence" requires a foreign
component.

DOJ argues that the information withheld under Exemption 1
would "reveal the actual intelligence activities and methods used
by the FBI against specific targets of foreign counterintelligence
investigations or operations; would identify a target of a foreign
counterintelligence investigation; and/or would disclose the
intelligence gathering capabilities of the activities or methods

-11-

directed at specific targets." Def.'s Mot. at 10; Hardy Decl. ¶ 42. DOJ further states that these activities and methods are still used by the FBI and the information is related to the development of sources and methods related to UAV technology. Def.'s Mot. at 10.

DOJ also contends that disclosure of this information could reasonably be expected to cause harm to national security for several reasons. Id. First, disclosure would reveal current intelligence-gathering methods being used by the FBI. Second, disclosure would reveal current specific targets of the FBI's national security investigations. Third, disclosure would reveal criteria and priorities assigned by the FBI to conduct intelligence and counterintelligence investigations. Fourth, disclosure would reveal the capabilities and limitations of the UAVs used, which would diminish their usefulness as an intelligence asset. Fifth, disclosure would reveal operational partners of the FBI who are intelligence sources. Finally, disclosure would reveal information about FBI UAV intelligence-gathering methodology. Id.; Hardy Decl. ¶ 43.

CREW counters that "the domestic use of drones by the FBI . . . does not constitute an 'intelligence activity' or 'intelligence sources or methods' within the meaning of E.O. 13,526." Pl.'s Mot. at 13 (emphasis in original). CREW's first objection is in response to DOJ's statement that the intelligence

activities and methods at issue here are "used by the FBI against specific targets o[f] foreign counterintelligence investigations or operations[.]" Pl.'s Mot. at 14 (quoting Hardy Decl. ¶ 42). CREW emphasizes that its FOIA request does not concern FBI drone use abroad--only domestic use --and therefore does "not implicate, much less compromise, foreign intelligence activities and methods." Id. at 15. CREW also argues that former FBI Director Robert Mueller's statements to Congress are inconsistent with the FBI's statement in this case that some of the Exemption 1 documents withheld relate to foreign counterintelligence investigations. See Pl.'s Reply at 2; see also Pl.'s Mot. at 3-4 (describing Director Mueller's Congressional testimony and the FBI's follow-up responses).

First, despite CREW's assertions, its FOIA Request relates to "all drones used by the FBI" (emphasis added), without differentiating between foreign and domestic use.[1] FOIA Request at 1. Second, Director Mueller's testimony is not inconsistent with the FBI's statement that withheld documents relate to foreign counterintelligence investigations. In response to written follow-

---

[1] Even if Plaintiffs were only seeking information limited to domestic drone use, and even if domestic use did not implicate foreign intelligence, it is unlikely that information about domestic use can be separated from information about foreign use. The two overlap and revealing information about domestic sources and methods would necessarily reveal the sources and methods for foreign use, which is classified and exempt.

up questions after the Congressional hearing, the FBI reported that it had used "UA[V]S in eight criminal cases and two national security cases." Pl.'s Mot. at 4 (citing Ex. A, Responses of the Federal Bureau of Investigation to Questions for the Record Arising from the June 19, 2013, Hearing Before the Senate Committee on the Judiciary Regarding "Oversight of the FBI" ("Hearing Responses") [Dkt. No. 19-2]). "National security cases" is a broad category and by no means excludes foreign counterintelligence activities.

In addition, the FBI's statutory duties include protecting the United States from terrorism and threats to national security, as well as furthering the foreign intelligence objectives of the United States. Def.'s Opp'n at 2 (citing Hardy Decl. ¶ 66); see also FBI, Quick Facts, www.fbi.gov/about-us/quick-facts (last visited November 17, 2015). It logically follows that the FBI's use of drones relate to issues of national security and the intelligence activities of the United States.

CREW next argues that the FBI's domestic drone program does not constitute an "intelligence activity, source, or method." Pl.'s Mot. at 15. CREW contends that "[u]sing drones to locate victims of kidnapping and search and rescue operations has nothing to do with 'securing . . . data pertaining to foreign governments or the national defense and security of the United States." Id. (emphasis added in Pl.'s Mot.) (quoting CIA v. Sims, 471 U.S. 159, 171 (1985)).

Sims does not support CREW's argument. First, the quote is not from the Supreme Court itself, but rather from a Senate hearing. See Sims, 471 U.S. at 171. When the quote above is read in context, it is clear that "data" is meant to be synonymous with "information," and is not meant to limit the type or form of information. See id. at 170-71. The omitted portion of the Sims quote refers to "all possible data," and the Supreme Court's holding takes an expansive view of what constitutes an "intelligence source." Id. at 170-171 (emphasis added) (CIA gathers "intelligence from almost an infinite variety of diverse sources"). Sims simply does not support a narrow reading of "intelligence activities."

CREW thus fails to rebut Defendant's claims of exemption. Defendant has, as discussed above, explained how the withheld information relates to intelligence activities and sources that, if disclosed, could reasonably be expected to cause harm to the United States' national security interests. The Court holds that DOJ has carried its burden and that these documents were properly exempted from production.

b.   *Foreign Relations or Foreign Activities*

Next, CREW argues that the documents were improperly withheld under Exemption 1 because they do not pertain to the foreign activities of the United States. Pl.'s Mot. at 13 (quoting Judicial Watch, 715 F.3d at 941).

As discussed above, although CREW characterizes its FOIA request as pertaining exclusively to the FBI's domestic drone program, any such limitation is absent from the FOIA Request itself. See Id.; FOIA Request. While the FBI's public comments describe its drone use as supporting "missions related to kidnappings, search and rescue operations, drug interdictions, and fugitive investigations," the FBI also stated that drones have been used in "two national security cases." Hearing Responses at 7. In short, the FBI's comments do not rule out the possibility of drone use pertaining to foreign activities or foreign relations.

DOJ claims that the information withheld "contains sensitive intelligence information gathered by the United States either about or from a foreign country." Def.'s Mot. at 11 (quoting Hardy Decl. ¶ 46). DOJ states that disclosure "could jeopardize the fragile relationships that exist between the United States and certain foreign governments." Def.'s Mot. at 11. DOJ lists several additional harms that can be expected from disclosure of information concerning foreign relations or foreign activities of the United States. See Def.'s Mot. at 11-12; Hardy Decl. ¶¶ 46-47.

CREW also fails to rebut DOJ's claims of exemption for foreign activities. DOJ has asserted that the documents implicate foreign relations and/or foreign activities, and have adequately described the potential harms that would result from disclosure.

2.   FOIA Exemption 3

FOIA Exemption 3 precludes release of information that has been:

> specifically exempted from disclosure by [another] statute [that] . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). In determining whether Exemption 3 properly applies, the Court conducts a two-part test that considers: whether "[1] the statute in question [is] a statute of exemption as contemplated by exemption 3 . . . [and whether] [2] the withheld material satisf[ies] the criteria of the exemption statute." Fitzgibbon v. CIA, 911 F.2d 755, 761 (D.C. Cir. 1990) (citing Sims, 471 U.S. at 167).

Defendant has withheld documents under Exemption 3 based on Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), 50 U.S.C. § 3024(i)(1). The NSA states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." Id. CREW does not contest that Section 102A(i)(1) of the NSA is an Exemption 3 statute for purposes of FOIA. It contends only that the withheld material does not contain intelligence sources and methods and therefore does not fall within Section 102A(i)(1). Pl.'s Mot. at 16.

CREW's argument is similar to its objections under Exemption 1, namely that the protection afforded "intelligence sources and methods" by the NSA relates only to "information the Agency needs to perform its statutory duties <u>with respect to foreign intelligence</u>." <u>Id.</u> at 16-17 (emphasis added in Pl.'s Mot.) (quoting <u>Sims</u>, 471 U.S. at 170). CREW alleges that the documents it seeks relate only to domestic drone use, and therefore are beyond the scope of the NSA's authority to withhold documents. <u>Id.</u> at 17.

The mere fact that the FBI uses a drone domestically does not mean that the use does not involve foreign intelligence or counter-intelligence. Mr. Hardy has affirmatively stated here that the information withheld would "reveal the actual intelligence activities and methods used by the FBI against specific targets of <u>foreign counterintelligence investigations or operations</u>." <u>See</u> Def.'s Mot. at 10 (emphasis added) (citing Hardy Decl. ¶ 42). As discussed above in Section III.B.1.a, CREW has not successfully rebutted this.

Thus, the Court concludes that DOJ has provided sufficient details justifying application of Exemption 3 and that the information was properly withheld under Section 102A(i)(1) of the NSA.

3.   FOIA Exemption 4

FOIA Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person" that are "privileged or confidential." 5 U.S.C. § 552(b)(4). Such information is exempt only if it meets all three requirements: It must be (1) commercial, financial, or a trade secret; (2) obtained from a person; and (3) privileged or confidential. See Pub. Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983); COMPTEL v. Fed. Commc'ns Comm'n, 910 F. Supp. 2d 100, 114-115 (D.D.C. 2012).

DOJ has withheld two subcategories of commercial information: (1) solicitation-related material and (2) operator manuals and a vendor training schedule. CREW contends that the Government improperly withheld information under Exemption 4 because the information is not confidential.

Our Court of Appeals, sitting en banc, has distinguished between tests of confidentiality under Exemption 4 based on whether the information was submitted to the government voluntarily or involuntarily. See Critical Mass III, 975 F.2d at 879. In Critical Mass III, our Court of Appeals held that voluntarily submitted information subject to a FOIA request is confidential under Exemption 4 when the information "is of a kind that would customarily not be released to the public by the person from whom

it was obtained." Id.; see also Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 320 (D.C. Cir. 2006).

On the other hand, where commercial or financial information is submitted to the government involuntarily or on a mandatory basis, it is considered confidential only if "disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 244 F.3d 144, 147-48 (D.C. Cir. 2001) (quoting Critical Mass III, 975 F.2d at 878). Less protection is provided for involuntarily submitted information because disclosure does "not seriously threaten[]" the Government's future access to the information. Id. at 148. In addition, "[t]he court will generally defer to the agency's predictive judgments as to the repercussions of disclosure." Jurewicz v. U.S. Dep't of Agric., 741 F.3d 1326, 1331 (D.C. Cir. 2014) (citing United Techs. Corp. v. Dep't of Def., 601 F.3d 557, 563 (D.C. Cir. 2010)) (internal quotation marks omitted).

The parties agree that the information at issue under Exemption 4 was submitted involuntarily for purposes of the Critical Mass III framework. See Pl.'s Mot. at 19-20; Def.'s Opp'n at 8 n. 5. Applying the involuntarily submitted information standard, DOJ argues that the information, if released, would cause

substantial competitive harm to the vendors, as well as impair the government's ability to obtain necessary information in the future, and is therefore confidential.

a.   *Contract Solicitation Materials*

The first category of information withheld under Exemption 4 is comprised of a vendor's solicitation for a contract proposal. Def.'s Mot. at 15 (citing Hardy Decl. ¶ 56). The solicitation includes a Firm Fixed Pricing Summary Sheet, Conditions on Estimate, and a "Commercial U.S. Conditions - UAS Products 7 Services" statement. Hardy Decl. ¶ 56.

DOJ focuses on the fact that the vendor does not typically release this information to the public and that on each page, the vendor included a footer stating: "This proposal includes [vendor name], proprietary or confidential data that shall not be disclosed outside the Government, nor shall it be duplicated or used by the recipient, in whole or in part, for any purpose other than to evaluate this proposal. Furthermore, this material is exempt from disclosure under FOIA because it contains trade secrets and/or commercial or financial information that is privileged or confidential." Id. But the DOJ's emphasis is misplaced, as it reflects the standard for voluntarily (not customarily released to the public), rather than involuntarily (substantial competitive harm), submitted information. See Critical Mass III, 975 F.2d at 879.

DOJ next argues that release of the information would impair the FBI's ability to obtain similar information from vendors in the future. Def.'s Opp'n at 8 (citing Second Declaration of David Hardy ¶ 8 ("Second Hardy Decl.") [Dkt. No. 23-2]). Mr. Hardy states that withholding the information under Exemption 4 "encourages all future submitters to furnish useful commercial or financial information to the government without hesitation, and it also provides the government with an assurance that the required submissions will be reliable." Second Hardy Decl. ¶ 8(c). The Court finds this argument unpersuasive, as DOJ has not sufficiently explained how disclosure will make future contract solicitation submissions less reliable.

DOJ's next argument is that this information, if released, would "cause substantial harm to the vendor's competitive position." Def.'s Opp'n at 7. DOJ explains that the information would provide potential competitors "with key inside information that would undercut the vendor's position in the market because this vendor sells this type of equipment and services only to law enforcement entities." Id. at 7-8 (emphasis added). DOJ fails to fully explain the relevance of the fact that the vendor exclusively sells this type of equipment to law enforcement entities.

A declaration from the vendor, submitted in camera, provides more detail regarding the potential competitive harm. See Second

Vendor Declaration ¶¶ 7-13 ("Second Vendor Decl."),[2] Ex. A to Second Hardy Decl. (in camera submission). The vendor argues that the pricing information, if disclosed, would enable commercial customers to determine the vendor's unit pricing and enable the customers to bargain down the prices more effectively. Second Vendor Decl. ¶ 7. Prices given to the government are often lower than those offered to commercial customers, and if the pricing information were disclosed, commercial customers would seek price concessions similar to those given to the government. Id. ¶¶ 5-7.

The pricing information would also help the vendor's competitors underbid it on future government solicitations. Id. ¶ 7. The vendor states that it competes with several other manufacturers to obtain contracts with the government and that the equipment unit price is a critical factor. If the unit price were revealed, competitors could underbid the vendor by simply lowering their unit price below the vendor's. Id. ¶¶ 9-10.

The vendor makes similar arguments with regard to the training information and commercial terms and conditions included in the contract document. Id. ¶¶ 11-13. The vendor contends that release of this information would enable competitors to determine what

---

[2]  Exhibit A to the Second Hardy Declaration contains two declarations by the vendor, which share the same title and are not distinguishable by pagination or paragraph numbers. The first vendor declaration will therefore be referred to as "First Vendor Decl.," and the second as "Second Vendor Decl.").

training the vendor offers at what price, and what conditions the pricing is based on. This would enable competitors to undercut prices, as well as offer potentially more advantageous terms and conditions. Id.

The Court agrees that public release of this information would cause serious competitive harm to the vendor. The vendor must diligently protect this information at every juncture. The vendor requires non-disclosure agreements from third-party commercial intermediaries, confidentiality agreements from employees, and does not share this information with competitors or the public. It would put the vendor at a distinct disadvantage in bid solicitations if its pricing information were made public.

The Court concludes that disclosure of the contract solicitation documents would cause substantial harm to the competitive position of the vendor. Therefore, the documents are considered confidential for purposes of Exemption 4 and were properly withheld.

b.   *Operator Manuals and Training Documents*

DOJ also withheld a second category of documents under Exemption 4, comprised of operator manuals and vendor training documents. See Def.'s Mot. at 16. The manuals contain "a comprehensive overview of the design, operation, capabilities, and maintenance" of the UAVs, including characteristics that are unique to the vendor's UAVs. Id. (quoting Hardy Decl. ¶ 58). The

-24-

vendor asserts that disclosure would seriously and adversely affect its competitive position because a competitor could utilize the information to improve the designs of its products to better compete with the vendor on future products. Id. (citing Hardy Decl. ¶ 58). The vendor again asserts that the training manuals would also permit competitors to determine what training the vendor provides and at what price, which could be used to compete with the vendor in the future. See First Vendor Decl. ¶¶ 9-10.

CREW's two objections are that the Hardy declaration "merely parroted the [vendor's] response" and that UAV operator manuals and training documents are already in the public domain. Pl.'s Mot. at 21.

Regarding CREW's first objection, the fact that DOJ relies on the statements of the vendor regarding anticipated competitive harm is no reason to disregard DOJ's arguments. CREW does not challenge the substance--that competitive harm will result from disclosure--of the vendor and DOJ's assertions.

With regard to its second objection, CREW does not assert that the withheld materials are the same as those in the public domain, see Pl.'s Mot. at 21-22, but do point to different UAV manuals and training documents which are in the public domain. However, the existence of those manuals and training documents do not indicate that the vendor's sensitive information is already public, nor does it necessarily diminish the vendor's concerns of

competitive harm. Plaintiffs have not shown that the manuals are identical, or even comparable. Indeed, the manuals CREW cites are published by the United States Army and the Australian Government's Civil Aviation Safety Authority, not commercial entities. Id. Nor are they specific to any particular vendor or equipment.

For these reasons, the public documents Plaintiff refers to in no way suggest that the withheld documents are already public, nor do they eliminate the vendor's competitive harm concerns.

DOJ has sufficiently shown substantial competitive harm to the vendor if its manuals and training documents were to become public, and the Court concludes that the documents are therefore confidential. Thus, DOJ has met its burden of showing why Exemption 4 applies to the UAV manuals and training documents.

### 4.   FOIA Exemption 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have construed this language to exempt those documents "normally privileged in the civil discovery context," including those protected by the attorney work product and attorney client privileges. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also Martin v. Dep't of Justice, 488 F.3d 446, 455 (D.C. Cir. 2007). In addition, "[t]he privilege . . . extends to all situations in which an attorney's counsel is

sought on a legal matter." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980). Therefore, "it is clear that an agency can be a 'client' and agency lawyers can function as 'attorneys' within the relationship contemplated by the privilege." Id. at 863.

The FBI withheld documents pursuant to the deliberative process privilege, which protects intra- and inter-agency documents that are both "predecisional and deliberative." Mapother v. Dep't. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A document is predecisional if "it was generated before the adoption of an agency policy" and it is deliberative if "it reflects the give-and-take of the consultative process." Judicial Watch v. Food & Drug Admin., 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting Coastal States, 617 F.2d at 866).

CREW first challenges the Exemption 5 withholdings on the ground that DOJ failed to give consideration to "whether any of the withheld documents contain information actually incorporated into a final agency decision," because to the extent the "documents reflect information in the final [agency documents], . . . the privilege would no longer apply." Pl.'s Mot. at 24. CREW fails to cite any case law in either its Motion or its Reply in support of this statement. See id. at 23-24; Pl.'s Reply at 8-9. Given the complete lack of support for the proposition that draft or predecisional documents that reflect information in the agency's

final decision are no longer privileged,[3] this argument must be rejected.

CREW next argues that, for the documents withheld on the grounds of deliberative process privilege, any segregable factual information is not protected by Exemption 5 and should have been released. See Pl.'s Mot. at 24. This argument claims that the FBI failed to properly segregate and release non-exempt portions of the documents, and will be addressed in Section III.B.6, along with Plaintiff's other segregability arguments.

DOJ has sufficiently explained what documents it has withheld and why. DOJ described in detail that the documents reflect an ongoing dialogue within the agency during the development of various policy and program issues. The Court concludes that the documents clearly fall within the scope of the deliberative process privilege and were properly withheld under Exemption 5.

5.    FOIA Exemption 7(E)

FOIA Exemption 7(E) precludes disclosure of responsive documents, records or information that has been:

> compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement
> records or information . . . (E) would disclose
> techniques and procedures for law enforcement
> investigations or prosecutions, or would disclose

---

[3] Plaintiff appears to argue the inverse in its Reply, stating that "where the drafts 'became final documents that reflect agency decisions,'" they "therefore fall within the exemption." Pl.'s Reply at 9 (quoting Def.'s Opp'n at 12). Plaintiff provides no support for this argument and its earlier contrary argument.

> guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be
> expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7).

Information withheld under Exemption 7 must "first meet a threshold requirement: that the records were compiled for law enforcement purposes." Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 202-03 (D.C. Cir. 2014)) ("Public Emps."). It is undisputed that the information withheld by the FBI was compiled for law enforcement purposes and meets the threshold requirement. See Pl.'s Mot. at 25; Def.'s Opp'n at 13.

There is some disagreement in the courts as to the proper reading of Exemption 7(E). As discussed above, Exemption 7(E) covers "techniques and procedures for law enforcement investigations or prosecutions" as well as "guidelines for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E) (emphases added). The final clause of the exemption requires that an agency demonstrate that the disclosure of the records at issue "could reasonably be expected to risk circumvention of the law." Id. The "risk circumvention of the law" requirement clearly applies to records containing "guidelines," because the requirement follows directly after the phrase "would disclose guidelines for law enforcement investigations or

prosecutions." However, there is some disagreement over whether
the requirement also applies to records containing "techniques and
procedures." Id.

The Second Circuit has held that the "risk circumvention of
the law" requirement applies only to guidelines, and DOJ urges
this Court to adopt a similar reading. See Allard K. Lowenstein
Int'l Human Rights Project v. Dep't of Homeland Sec., 626 F.3d
678, 681-82 (2d Cir. 2010); Def.'s Mot. at 25-26. By contrast, in
Blackwell v. FBI, our Court of Appeals applied the "risk
circumvention of the law" requirement to techniques and
procedures, as well as guidelines. 646 F.3d 37, 41-42 (D.C. Cir.
2011). Although the Blackwell Court did so without any discussion
of the applicability of the requirement, the Court of Appeals
acknowledged the Blackwell holding in Public Emps., and did not
question it. 740 F.3d at 205 n.4. The Court did comment that it
was not clear that, "given the low bar posed by the 'risk
circumvention of the law' requirement, . . . the difference matters
much in practice." Id.

Of course, this Court is bound to follow the precedent of our
Court of Appeals, and therefore the Court must apply the "risk
circumvention of the law" requirement to techniques and
procedures, as well as guidelines.[4]

---

[4] Although this Court is bound by precedent, the Court agrees that
a plain reading of the statute suggests that the "risk

-30-

Exemption 7(E)'s requirement that disclosure risk circumvention of the law "sets a relatively low bar for the agency to justify withholding." Blackwell, 646 F.3d at 42. "To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" Public Emps., 740 F.3d at 205 (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009)); see also Blackwell, 646 F.3d at 42 (the Exemption looks for "the chance of a reasonably expected risk.")

The FBI withheld several categories of documents under Exemption 7(E), only some of which CREW challenges. The first category that CREW challenges is the withholding of information regarding UAV operational capabilities and equipment specifications. Pl.'s Mot. at 26-27. These documents contain "information specific to the development of UAV[s] as an effective investigative technical tool for national security and criminal investigations." Def.'s Mot. at 28. DOJ states that disclosure of these documents could reasonably be expected to increase the risk of circumvention of the law because the information would provide

_____

circumvention of the law" requirement applies only to guidelines. Because the Court finds the documents were properly withheld even under the "risk circumvention of the law" requirement, the parties' dispute over the proper reading of Exemption 7(E) does not affect the outcome.

key details on various law enforcement techniques and procedures.
Def.'s Mot. at 28-29.

CREW does not dispute that disclosure of the non-public
operational capabilities and equipment specifications would
increase the risk of circumvention of the law. Rather, CREW argues
that the FBI has failed to show that the operational capabilities
and equipment specifications withheld are not already generally
known to the public. See Pl.'s Mot. at 26. CREW provides examples
of websites describing the capabilities of the Predator B drone
used by the Air Force, as well as articles and surveys discussing
drone operational capabilities, to support its argument that
operational capabilities and limitations of drones are already
widely known and therefore not subject to Exemption 7(E). Id.
at 26-27.

This argument assumes that all drones are alike. While drones
may generally face similar challenges across the board (i.e.
weather or flight control issues), it does not logically follow
that all of their capabilities and limitations are similar, or
that to know one is to know them all. DOJ explicitly states that
the information withheld contains "non-public investigative
techniques and procedures." Def.'s Opp'n at 15 (citing Hardy Decl.
¶¶ 76-78) (emphasis in original). The public information cited by
CREW does not raise doubts about the veracity of DOJ's claim.

The next category CREW challenges is "information regarding the specific types of equipment, systems, software, hardware, control devices, and other details showing the capabilities, limitations, and technological advancements of certain UAVs, as well as the identity of UAV vendors and suppliers." Def.'s Mot. at 28; see also Pl.'s Mot. at 28.

CREW again argues that specifics about the drone equipment government agencies use, as well as their capabilities and limitations, are widely available and therefore not subject to Exemption 7(E). Pl.'s Mot. at 28. This argument is rejected for the same reasons discussed above.

CREW also argues that vendor and supplier identities are not law enforcement techniques within the meaning of Exemption 7(E). Id. DOJ's argument is that disclosure of the vendor would, due to the vendor's niche market, reveal the equipment and services provided to the FBI. This would "effectively reveal knowledge about the FBI's surveillance capabilities . . . and limitations." Def.'s Opp'n at 19 (citing Second Hardy Decl. ¶ 8(c) & n.4). Consequently, DOJ argues, criminals and foreign entities would have key information that could be used in countermeasure efforts. Id. at 18-19. "If the FBI were forced to use compromised equipment it would have an immeasurable, negative effect on current and/or future investigations and law enforcement response capability of the FBI." Id. at 18. The Court agrees.

The third and fourth categories of documents that CREW challenges are comprised of information regarding UAV training, pilot qualifications, and funding details. See Pl.'s Mot. at 29. CREW argues that DOJ "merely parrot[s] the language of Exemption 7(E)" and therefore DOJ fails to meet its burden of proving that the information is properly exempt. Id. CREW also argues that the FBI's justifications rely on "overblown claims of harm" that are not commensurate with the information CREW seeks. Pl.'s Reply at 12.

In its Opposition, DOJ explained that releasing information about training and the associated equipment procedures "is tantamount to releasing information about the actual employment of the procedures and techniques themselves." Def.'s Opp'n at 19. The Court agrees that the training and equipment information, if disclosed, would reveal law enforcement techniques and procedures, which, as discussed previously, could reasonably be expected to risk circumvention of the law.

Similarly, DOJ argues that releasing funding information and details as to how and what the FBI is acquiring as part of its UAV program is tantamount to releasing information about UAV capabilities, program sophistication, vendor identity, and the scope and direction of the UAV program. Id. at 19-20; Hardy Decl. ¶ 82. The funding details include "funding account numbers, bank routing numbers, purchase order numbers, specific contractual

-34-

terms and conditions, product numbers or codes, product descriptions including parts, repair requests, and product pricing, purchase order approval procedures, and funding allocation and budgeting details." Hardy Decl. ¶ 81. DOJ has properly withheld this information under Exemption 7(E).

The final category of information CREW challenges is described as "non-public details regarding UAV use and tradecraft." Def.'s Mot. at 32; see also Pl.'s Mot. at 30. DOJ explains that the FBI's tradecraft "constitutes the body of techniques and procedures it employs to administer and operate its UAV program for law enforcement and national security purposes." Def.'s Opp'n at 20.

This is essentially an umbrella exemption that DOJ uses as a catch-all justification for withholding information. DOJ concedes that this rationale is not used to withhold any information that was not already withheld under Exemption 7(E) on another basis. Rather, all the information otherwise withheld pursuant to Exemption 7(E) is also withheld on the basis of "UAV use and tradecraft." Id. at 20-21. The justification for this is that "each piece of non-public information detailing the FBI's UAV program has a functional nexus to the administration and operation of the UAV program." Id. at 20. DOJ argues that releasing any of the non-public details regarding the FBI's UAV use and tradecraft "could enable potential targets of the FBI to assemble information about

the program to reverse engineer the FBI's use and capabilities, neutralizing or significantly degrading the FBI's ability to use the technique." Id. at 21.

The Court finds this exemption too broad and in conflict with the Supreme Court's mandate that FOIA's exemptions should be narrowly construed. See Milner v. Dep't of Navy, 562 U.S. 562, 563 (2011) (FOIA's "goal is broad disclosure" and thus "the exemptions must be given a narrow compass") (internal quotation marks and citation omitted). DOJ's argument that every detail relating to FBI's tradecraft is exempt from disclosure because of the possibility that it could be compiled with other information is both vague and attenuated. This is not to say that tradecraft information can never be withheld, but Defendant has not met its burden here.

Despite the Court's rejection of DOJ's tradecraft argument, it finds that DOJ sufficiently explained its reasons for withholding other categories of documents and has shown that disclosure would increase the risk of circumvention of the law. The Court therefore concludes that the documents were properly withheld under Exemption 7(E).

6.   Segregability

CREW argues that the FBI has failed to segregate and release all non-exempt information responsive to its FOIA Request. See Pl.'s Mot. at 30-32. FOIA requires that "[a]ny reasonably

-36-

segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Elliott v. U.S. Dep't of Agric., 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)). To demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" for its non-segregability. Mead Data, 566 F.2d at 261. "However, the agency is not required to provide so much detail that the exempt material would be effectively disclosed." Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002).

DOJ has explained that the FBI examined each responsive page individually to identify non-exempt information and "re-reviewed all pages to ensure that all segregable non-exempt information has been released." Def.'s Opp'n at 22 (quoting Hardy Decl. ¶ 30). For pages that were withheld in full, DOJ asserts that any non-exempt information was so intertwined with exempt material such that it could not be reasonably segregated. Id. at 22-23.

"Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citing Boyd v. Criminal Div. of U.S. Dep't of Justice, 475

F.3d 381, 391 (D.C. Cir. 2007)). "If the requester successfully rebuts this presumption, the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." Id. (citing 5 U.S.C. § 552(a)(4)(B)).

CREW argues that the FBI's "blanket assertion" that it has re-reviewed all pages to ensure all the segregable non-exempt information was released is inadequate to meet its burden of proof. Pl.'s Mot. at 31. CREW cites Chesapeake Bay Found. v. U.S. Army Corps of Eng'rs, 677 F. Supp. 2d 101 (D.D.C. 2009), but the facts of that case are easily distinguishable. In Chesapeake Bay, the agency did not specifically address segregability and not a single document was released in part. See id. at 103, 109, 109 n.1. That is not the case here.

As discussed above, an agency is not required to provide so much detail that the exempt material is in effect disclosed. Our Court of Appeals held in Johnson that a comprehensive Vaughn index, along with an affidavit that a line-by-line segregability review of each document withheld in full, was sufficient to fulfill the agency's obligation to show that further segregability was not feasible. See Johnson, 310 F.3d at 776. Like the agency in Johnson, DOJ has provided a detailed Vaughn index and an affidavit asserting that each responsive document was re-reviewed for segregability. See Def.'s Mot. at 33 (citing Hardy Decl. ¶ 30).

-38-

CREW also argues that the documents withheld under Exemption 5 specifically contain segregable information that should be released. CREW contends that the documents contain factual information that is not privileged, and therefore outside the scope of the exemption. See Pl.'s Mot. at 24, 31.

Absent a claim that disclosure would jeopardize state secrets, "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context" are generally discoverable in civil litigation, and by analogy, are also not protected by Exemption 5. Envtl. Prot. Agency v. Mink, 410 U.S. 73, 87-88 (1973) (emphasis added)(superseded by statute on other grounds, Freedom of Information Act, Pub. L. No. 93-502, 88 Stat. 1561, as recognized in CIA v. Sims, 471 U.S. 159, 189 n.5 (1985)).

CREW does not allege that any of the withheld documents contain compiled factual material and identifies only one example of "purely factual" information it believes improperly withheld. Plaintiff alleges that Certificates of Waiver or Authorization ("COAs") contain purely factual information. Pl.'s Mot. at 31-32. The Federal Aviation Administration (FAA) describes a COA as:

> an authorization issued by the Air Traffic Organization to a public operator for a specific UA[V] activity. After a complete application is submitted, FAA conducts a comprehensive operational and technical review. If necessary, provisions or limitations may be imposed as part of the approval to ensure the UA[V] can operate

safely with other airspace users. In most cases, FAA
will provide a formal response within 60 days from the
time a completed application is submitted.

Pl.'s Mot. at 6 (quoting Certificates of Waiver or Authorization

(November 14, 2014), available at https://www.faa.gov/about/

office_org/headquarters_offices/ato/service_units/systemops/aaim

/organizations/uas/coa/).

While COAs may contain some factual information, it is not

clear that they contain "purely factual material." Mink, 410 U.S.

at 88. CREW has not alleged what the purely factual material is

likely to be, or why it thinks the COAs contain it. Pl.'s Mot. at

31-32. Consequently, CREW has not shown that the COAs are the type

of factual information that is outside the scope of Exemption 5 as

described in Mink. Although CREW asserts the existence of a "myriad

[of] factual issues" that call into question the FBI's claim of

proper segregation, it provides only the single example of COAs.

Id. That one somewhat vague assertion is not sufficient to rebut

the presumption that the FBI complied with its obligation to

disclose reasonably segregable material.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment shall be **denied,** and DOJ's Motion for Summary Judgment shall be **granted.** An Order shall accompany this Memorandum Opinion.


February 9, 2016
                          *Gladys Kessler*
                          Gladys Kessler
                          United States District Judge


**Copies to:** attorneys on record via ECF